# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**MARTRICE HERRINGTON,**
**MARCHEA HERRINGTON, and**
**REGINALD HUNTER,**

*Plaintiffs,*

v.

**THE BOARD OF REGENTS FOR**
**THE STATE UNIVERSITY SYSTEM**
**OF GEORGIA**, **SONY PERDUE**, in his
official capacity as Chancellor of the
Board of Regents for the State University
System of Georgia, **RICHARD WOODS**, in
his official capacity as the Commissioner of
Education of the State of Georgia,
**HAROLD REYNOLDS,**
**TOM BRADBURY, RICHARD EVANS,**
**W. ALLEN GUDENRATH, ERIN HAMES,**
**DOUG ALDRIDGE, SAMUEL D. HOLMES,**
**BARBARA R. HOLMES, C. THOMAS**
**HOPKINS, JR., M.D., JAMES M. HULL,**
**CADE JOINER, PATRICK C. JONES,**
**C. EVERETT KENNEDY III,**
**SARAH-ELIZABETH LANGFORD,**
**LOWERY HOUSTON MAY,**
**JOSE R. PEREZ, NEIL L. PRUITT, JR.,**
**T. DALLAS SMITH,** and
**JAMES K. SYFAN, III**,
all of whom are named in their official capacity
as members of the Board of Regents for the
State University System of Georgia and
**THE STATE OF GEORGIA**,

*Defendants.*

Jury Trial Demanded

Case No.: _____

<u>**COMPLAINT**</u>

**COME NOW** Plaintiffs **MARTRICE HERRINGTON**, **MARCHEA HERRINGTON**, and **REGINALD HUNTER** (collectively, "Plaintiffs," and each a "Plaintiff,") by and through undersigned counsel hereby bring this civil action based upon the personal knowledge of Plaintiffs and based upon the investigation of counsel, against Defendants **SONY PERDUE**, in his official capacity as Chancellor of the Board of Regents for the State University System of Georgia, **RICHARD WOODS**, in his official capacity as Commissioner of Education of the State of Georgia, **THE BOARD OF REGENTS OF THE STATE UNIVERSITY SYSTEM OF GEORGIA** (the "BOR"), including **HAROLD REYNOLDS**, in his official capacity as Chair of the Board of Regents for the State University System of Georgia, **RICHARD WOODS**, in his official capacity as the Commissioner of Education of the State of Georgia and thereby as a member of the BOR, **TOM BRADBURY**, **RICHARD EVANS**, **W. ALLEN GUDENRATH**, **ERIN HAMES**, **DOUG ALDRIDGE**, **SAMUEL D. HOLMES**, **BARBARA R. HOLMES**, **C. THOMAS HOPKINS, JR, M.D.**, **JAMES M. HULL**, **CADE JOINER**, **PATRICK C. JONES**, **C. EVERETT KENNEDY, III**, **SARAH-ELIZABETH LANGFORD**, **LOWERY HOUSTON MAY**, **JOSE R. PEREZ**, **NEIL L. PRUITT, JR.**, **T. DALLAS SMITH**, and **JAMES K. SYFAN, III**, all of whom are

named in their official capacity as members of the BOR, and the **STATE OF GEORGIA**, (collectively "Defendants," and each a "Defendant").

Plaintiffs seek equitable relief to require the State of Georgia ("Georgia" or the "State") and all other Defendants to take steps to make Albany State University ("ASU"), Fort Valley State University ("FVSU"), and Savannah State University ("SSU") equal and remedy Defendants' separate and unequal treatment of ASU, FVSU, and SSU, the State's three (3) public Historically Black Colleges and Universities ("HBCUs"), as required by Title VI of the Civil Rights Act of 1964 ("Title VI"), the Equal Protection Clause of the Fourteenth Amendment, *United States v. Fordice*, 505 U.S. 717 (1992), and all other applicable federal and state laws.

In support of Plaintiffs' Complaint, (the "Complaint"), Plaintiffs state as follows:

## INTRODUCTION

### I.     History of HBCUs/1890 Land-Grant Institutions

1.     HBCUs make innumerable contributions to our country through the research produced by their faculty, achievements of their students and alumni, and services that they provide to the immediate community.

2.      Many HBCUs were established by way of The Morrill Land-Grant Acts.  The Morrill Land-Grant Act of 1862 ("First Morrill Act") was designed to extend public higher education to broad segments of the U.S. population, and gave states, including Georgia, public lands, on the condition that those lands be sold or used for profit and those profits used to establish a college that would teach agriculture and the mechanical arts.

3.      Because many states refused to admit Black students to their universities, the Federal Government passed the Second Morrill Act of 1890 ("Second Morrill Act")[1], which was intended to promote equality and forbade awarding federal land-grants to states where a distinction of race or color was made in the admission of students to public colleges.

4.      The Second Morrill Act contained the requirement that state's practicing segregation, such as Georgia, "equitably" divide federal land-grant funds awarded to each state between their White and Black land-grant institutions.

5.      Many HBCUs were established as a result of the Second Morrill Act. These institutions offered courses in agricultural, mechanical, and industrial subjects.

---

[1] 7 U.S.C. § 321, et seq.

6.     HBCUs, including 1890 land-grant institutions, provide markedly greater access to underrepresented students than other institutions and they play a critical role in educating the next generation of Black talent in STEAM (science, technology, engineering, agriculture, and mathematics) fields—workforce areas that tend to be the least diverse.

7.     As noted in the HBCU Partners Act, while HBCUs, including 1890 land-grant institutions, represent 3 percent of postsecondary institutions, they enroll about 10 percent of all Black college students.  These institutions generate close to $15 billion in economic impact and over 134,000 jobs annually in the local and regional economies they serve.

8.     With respect to Georgia's HBCUs, they generate close to 1.6 billion in total economic impact, including direct spending by HBCUs on faculty, employees, academic programs, operations, and by students attending these institutions, as well as the follow-on effects of that spending.

9.     Unlike their white land-grant counterparts established in the Morrill Act of 1862, Black land-grant universities have been overlooked, dealt decades of discrimination, and starved for resources—even after designation as federal land-grant universities in the Second Morrill Act of 1890.

10.    The resource inequities between the 1890 land-grant institutions and their 1862 counterparts are vast.  For example, upon information and belief, research expenditures per full-time equivalent student are nearly three times greater at the

1862 institutions than at the 1890 institutions —a funding disparity due to deeply embedded biases, double standards, and scrutiny that 1890 institutions endure when competing for federal and state research dollars.

11.    Upon information and belief, endowments per full-time equivalent student are six times greater at the 1862 land-grant institutions than at the 1890 land-grant institutions.  At their inception, the 1890 institutions were denied perpetual funding for the "endowment, maintenance and support" provided to the 1862 institutions, resulting in untenable present-day inequities in endowment resources that support current operations and ensure future longevity.

12.    Upon information and belief, the 1862 land-grant institutions operated with $2 billion more in total revenues (federal, state, institutional) than the 1890 land-grant institutions.   As a result, Black land-grant universities operate on shoestring budgets, with fewer resources for research, technology, academic instruction, student support, and community programs.

13.    Upon information and belief, Black land-grant universities were excluded from federal formula payments for research and extension activities for eighty years, while their white land-grant counterparts received routine federal support.

14.    Upon information and belief, states have failed to equitably support 1890 land-grant institutions, while 1862 land-grant institutions flourished with state resources.  Indeed, upon information and belief, between fiscal years 2011 and 2022

alone, Black land-grant universities lost nearly $200 million in resources because states declined to provide matching funds while they fully funded their white land-grant universities.

## II.    Georgia's History Regarding HBCUs

15.    The longstanding history of practices that have consistently embraced official segregation remain deeply rooted in Georgia's public system of higher education.  Georgia instituted its system of public higher education in 1785 when it founded what is presently known as University of Georgia ("UGA") as a White-only institution.

16.    Following the Second Morrill Act of 1890, Georgia, rather than allow its Black citizens to attend UGA, designated SSU[2] (formerly known as the Georgia State Industrial College for Colored Youths) as its Black land-grant institution, thereby maintaining state-sponsored segregation in Georgia's public colleges and universities.

17.    For close to eighty-two (82) years after the creation of public higher education, Georgia denied its Black citizens access to college-level public higher education and did so for the purpose of maintaining the social, economic, and political subordination of Black people in the State.

---

[2] Georgia did not open a public institution for African Americans until 1890 when SSU (Savannah State University) began with five faculty members and eight students.  In 1947, the State's Board of Regents adopted a resolution moving the land-grant designation from SSU to Fort Valley State University (FVSU).

18.    When the Supreme Court handed down the *Brown v. Board of Education* decisions in 1954 and 1955, Georgia's dual higher education system was firmly in place.  Prior to *Brown*, no African American had been allowed to enroll in either undergraduate or graduate programs at UGA.  In contrast, with very limited programs offered and suffering from chronic State underfunding, Georgia's public HBCUs lagged behind its TWIs in all respects.

19.    *Brown* "held that the concept of 'separate but equal' had no place in the field of education."  The following year, in 1955, "the Court ordered an end to segregated public education 'with all deliberate speed.'"

20.    *Brown* aimed to eliminate segregation which had been touted as "separate but equal": institutions for Black students and institutions for White students.  In reality, segregation established and sustained a "separate and unequal" system of education, relegating Black students to separate and underfunded schools.

21.    With *Brown*, the legality of the prior system of segregation ended in 1954, but segregation did not disappear.  In many states, including Georgia, the vestiges of prior decades of separate and unequal treatment remain in effect to this day.

22.    Despite the decisions in *Brown*, many states, including Georgia, continued in their public university systems practices of *de jure* segregation, which is segregation by law or official segregation and the formal operation of a dual system for Black and White, or in this instance for HBCUs and TWIs.

23.    In 1970, it was determined that the State of Georgia was operating a dual system of higher education based on race in that past patterns of racial segregation had not been eliminated from most of the institutions within the system.

24.    In response, the Federal Office for Civil Rights mandated the State of Georgia to develop a plan to eliminate the vestiges of discrimination in higher education in Georgia.  Georgia was one of five states whose submitted plan was unacceptable, requiring modifications and submission of another plan. Georgia's plan was finally accepted in 1974, but acceptance of the plan was not definitive of the State's compliance with Title VI of the Civil Rights Act of 1964.

25.    Two 1977 court rulings, *Adams v. Califano*, 430 F. Supp. 118 (1977) and *Adams v. Richardson*. 356 F. Supp. 92 (D.DC), *modified and affirmed*, 480 F.2nd 1159 (D.C. Cir. 1973) determined that the 1974 plans submitted by the states, including Georgia, were not adequate to achieve desegregation in higher education. These rulings required Georgia to submit a revised plan that was finally accepted in March 1978 (the "1978 Plan").

26.    The purpose and intent of the 1978 Plan, as mandated by court and Federal government guidelines in 1977, was for the State of Georgia to: (i) specify steps to be taken to strengthen the role of traditionally Black institutions in the State system (including commitments that HBCUs would have the facilities, quality and range of academic programs, degree offerings, faculties, student assistance, and other resources which were at least comparable to those at traditionally White

institutions having similar missions; and commitments that necessary improvements would be made to permit these institutions to fulfill their defined missions); (ii) commit to the improvement and expansion of resources, (e.g., physical plant, program offerings, research equipment, financial support, student, faculty and professional staff services in accordance with HBCUs' missions); (iii) commit to take specific steps to eliminate educationally-unnecessary program duplication among White and Black institutions in the same service areas; (iv) commit to give priority consideration to placing any new undergraduate, graduate, or professional degree programs, courses of study, etc., which may be proposed at traditionally Black institutions, consistent with their missions; (v) commit to withhold approval of any changes in the operation of the State system or of any institutions that may have the effect of thwarting the achievement of goals; and (vi) desegregate student populations, administration, faculty, and staff.

27.   Due to Georgia's documented resistance and reluctance to fully implement the 1978 Plan once developed, the Office for Civil Rights monitored the State's progress.  Upon information and belief, it was determined that the amount of funds designated to improve the physical environments of the HBCU campuses were inadequate and the time it took to make improvements was far too long to have the desired impact or effect of reasonably attracting quality students.

28.   Upon information and belief, in 1984, the Office of Civil Rights documented the following commitments and deficiencies:

- <u>Commitment</u>: Add five (5) new programs each at Savannah State College and Fort Valley State College and six (6) at Albany State College to enhance the HBCUs and attract greater White enrollment.  Construction of a facility to house the new Criminal Justice Program at Albany State College was to begin in 1981 and resources allocated to strengthen the program.

- <u>Deficiencies</u>: The programs that were implemented were done so at substantial delay.  Two programs were never implemented.  Replacement programs had very small budgets and the replacement program at Fort Valley State College (Mass Communications) was to be housed in a building needing one million dollars in renovations.  There were low White enrollments at the programs located at HBCUs.  The State did not identify resources for strengthening programs.

- <u>Commitment</u>: Renovation and construction of new facilities.  Seek capital outlay cash appropriation in the amount of one million dollars for each of the three HBCUs for each of 5 consecutive years (15 million dollars total for three institutions over 5 years).

- <u>Deficiencies</u>: Many of the campus improvements, renovation and construction projects detailed in the 1978 Plan were not implemented at any time during the 5 years in which said projects were to have occurred.

Only four (4) of the new fourteen (14) buildings the State identified in the Plan were built.  Renovations were completed on only three (3) of the seven (7) buildings identified in the Plan.  Some buildings scheduled for demolition because of their condition were still in use; some even housed academic programs identified as enhancement programs in the Plan.  Some campus improvements were initiated but were not as extensive as promised and many other improvements were begun one to four years later than planned. There was extensive discussion regarding improvements and construction contemplated, but none were carried out as needed.

29.    Upon information and belief, the 1978 Plan identified 1.4 million dollars in land acquisition projects between 1978-79 and 1981-82 for expansion and to improve the appearance of the approaches and entrances to the HBCUs.  Instead, only $100,000 worth of land was acquired for campus enhancement.  Additionally, $75,000 needed in landscaping was not funded for the period from 1982-1983.

30.    Upon information and belief, only 6 million dollars (out of the $15 million dollars that was allocated for construction and improvements among the three of Georgia's public HBCUs) worth of renovations and construction was accomplished from 1978 to 1984, with the final renovations and construction projects completed in 1988, ten (10) years after the 1978 Plan.

31.    Given that Georgia had finally, after years of reluctance and resistance, built the necessary four (4) or five (5) buildings (total between all three (3)

campuses) and added the necessary four (4) or five (5) programs at each institution outlined in the 1978 Plan, the Office of Civil Rights, deemed Georgia to be in compliance with Federal requirements.

32.     However, subsequent to the Federal government's monitoring, the State of Georgia pursued a course of action to undo the little good for its public HBCUs that had been accomplished.   For example, Georgia elevated certain historically White institutions by designating them Regional and Comprehensive Universities. None of the three public HBCUs were given this designation, despite their statewide attraction to students.   Some of the public HBCUs were stripped of graduate programs that, in turn, affected their non-Black student enrollments, totally reversing the tide of integration at these institutions.

33.     The program offerings at Georgia's public HBCUs are still very limited, continuing the prior system of *de jure* segregation through segregative effect. Funding for existing niche programs, the novelty of which would naturally appeal to diverse populations, is lacking.   The refusal of the BOR to expand the academic offerings of State HBCUs and to allocate the funding for any such expansion undermines the institutions' collective ability to attract students of any racial/ethnic makeup.

34.     The BOR diverted resources away from the HBCUs to strengthen current academic programs at majority-White institutions with similar missions and

niche programs, to mimic HBCUs' premiere programs at TWIs, and to create new (competing) institutions within the system.

35.   The BOR was never committed, as purported in the 1978 Plan, to establish or give priority to graduate, specialized, or professional programs at the HBCUs.  The evidence lies with the fact that none of the three public HBCUs have a single specialized or professional program offering, with the exception of the Educational Specialist degree offered at Albany State University.

36.   None of the few unique niche programs at the HBCUs are supported at the level needed to establish reputability.  Special priority has been given, however, to TWIs for graduate, specialized and professional programs.

37.   Upon information and belief, newer facilities at Georgia's public HBCUs are constructed in terms of current enrollment and not projected growth, hampering the institutions' growth capabilities in terms of increased student enrollment, faculty expansion, community-based programs and the ability to obtain foundation and grant support.

38.   Georgia's public HBCUs have in common a status that includes limited mission assignments.  None of the State HBCUs rank as Research Institutions or share the responsibility for carrying out significant research activity.  Also, not one of the State HBCUs ranks as a Comprehensive University despite the fact that these institutions attract students not only regionally, but statewide and from outside the State.

39.     Despite the fact that the State HBCUs are substantially older than many majority-White peer institutions within the State, the State HBCUs are without the means to significantly impact the needs and goals of the State of Georgia in terms of personnel, professionals, and research activity.

40.     The few programs that have the potential to uniquely define the State HBCUs and give them meaning and significant purpose within the University System of Georgia are not adequately funded or otherwise supported as special initiatives to elevate them to equal standing among like majority-White institutions.

41.     ASU, FVSU, and SSU all offer the least comprehensive curricula in comparison to the other public institutions of higher learning within their respective l00-mile radii.

### III.     The Board of Regents

42.     In 1931, Georgia passed the Reorganization Act, which reorganized higher education in the State.  The Reorganization Act is significant because it created the Board of Regents, a statewide governing body for the University System of Georgia ("USG").

43.     The 1931 Reorganization Act called for the governor to appoint eleven members, one from each congressional district, and one at large.  The Act transferred to the BOR the responsibility for 26 institutions.

44.     The BOR has the exclusive right to govern, control, and manage the USG and all USG institutions.

45.    Since 1931, Georgia and the BOR have collectively overseen and adopted practices which have allowed for UGA, Georgia State University and other predominantly white institutions to flourish and grow over the years into the State's flagship institutions, while simultaneously underfunding and undermining Georgia's public HBCUs.

46.    Regarding the appropriation and allocation of funds to public universities and institutions, the BOR is the only medium through which formal requests can be made for appropriations from the General Assembly and the State's Governor.  The BOR then annually allocates funds to the USG institutions during their annual meeting.

47.    Upon information and belief, the BOR and the State use an appropriation funding formula that dictates how funds are allocated to higher education institutions (the "Funding Formula").

48.    The Funding Formula was intended to utilize several components, including: (i) Enrollment – traditionally the biggest driver of state appropriations for higher education institutions is the number of full-time equivalent students.  The State typically rewards institutions with higher enrollment figures, assuming that larger student populations necessitate more resources; (ii) Completion – funding based on performance or outcome metrics, like graduation rates; and (iii) High-demand fields – funding may be earmarked for programs in high-demand fields like science, technology, engineering, mathematics or healthcare.

49.     Through longtime practices of gross underfunding, discrimination and racism, the BOR's and State's use of the Funding Formula has negatively impacted Georgia's public HBCUs.

50.     It is critical that Georgia's public HBCUs receive appropriate funding to fulfill the rights that many of the State's Black students have been historically deprived of.

51.     Unequitable funding of Georgia's public HBUCs has caused a severe financial gap between those universities and Georgia's traditionally white institutions ("TWIs").  These funds could have supported infrastructure and student services and would have better positioned Georgia's public HBCUs to increase enrollment and compete for research grants.

## IV.    The Solution

52.     To remedy the past effects of segregation, and in addition to developing Georgia's public HBCUs' non-race based academic identities, Georgia should fund its public HBCUs at a level where they can reach equity with Georgia's public TWIs and support their operations, educational programs, infrastructure, and endowments.

53.     For example, for the Fall 2022 semester, State appropriations to FVSU amounted to $8,391.87 per student; State appropriations to ASU amounted to $4,166.89 per student; and State appropriations to SSU amounted to $6,612.59 per student, compared to UGA, which received $9,655.70 per student and Augusta University, which received $23,381.58 per student.

54.    The physical facilities at the State public HBCUs are inferior to the facilities at the TWIs.  Physical facilities and physical plants play major roles in potential students' (and the parents of those potential students) decision making. Maintaining unattractive, inadequate, and at times unhealthy physical facilities at the State public HBCUs through lack of funding equity is, too, a remnant of the prior *de jure* segregation system kept alive by the BOR.

55.    Georgia's public HBCUs rely on federal, state, and local funding more heavily than their non-HBCU counterparts.  For example, upon information and belief, for fiscal year 2022, FVSU received a State appropriation from Georgia of $21,894,392 for which it had an approved State budget for $69,735,194.  This appropriation from the State accounted for roughly 31% of FVSUs budget.  By comparison, UGA received $392,089,204 in State appropriations, which amounted to 25% of its budget of $1,559,448,231.  Consequently, FVSU is more reliant on State funding than UGA.  Similar comparisons can be drawn between Georgia's other public HBCUs and its TWIs.

56.    As a result of the aforementioned failures and others described herein, the student bodies at Georgia's public TWIs are still predominantly white, and the racial composition at Georgia's public HBCUs remains largely black.  As of the Spring of 2022, FVSU's student body racial composition was 91.3% Black/African American followed by 3.2% White/Caucasian; ASU's student body racial composition was 77.3% Black/African American followed by 10.9%

White/Caucasian; and SSU's student body racial composition was 83.8% Black/African American followed by 4.1% White/Caucasian.

57.    By way of comparison, Georgia's public TWIs remain racially identifiable with a majority of White students and a minority of Black students, as follows: Augusta University – 52.9% White versus 21.1% Black; University of Georgia – 65.9% White versus 8.1% Black; Georgia Southern University – 57.8% White versus 27% Black; University of North Georgia – 71.8% White versus 4.2% Black.

58.    Accordingly, Plaintiffs seek to enjoin Defendants from continuing to discriminate against them as students/former students at Georgia's public HBCUs— including Defendants' failure to dismantle the dual and unequal system of higher education to comply with *Fordice*, Title VI, and the Fourteenth Amendment.  This discrimination includes Defendants' failure to address Georgia's public HBCU's lack of program offerings, including the continuing absence of a meaningful number of non-core unique, high demand programs, and Defendants' failure to eliminate unnecessarily duplicated non-core programs at its public TWIs.

59.    Plaintiffs also seek to enjoin Defendants' current underfunding of Georgia's public HBCUs, and compel appropriate funding for such institutions, including ensuring Defendants award adequate State funds to Georgia's public HBCUs that redress the schools' historic underfunding.

60.     As compared with TWIs across the State, Georgia's public HBCUs have significantly fewer total students, and therefore cannot be compared to larger TWIs solely on a basis of per student funding.  Per student funding overlooks the economies of scale benefitting these larger schools and detrimentally impacting the HBCUs, which is not captured when only per student funding amounts are reviewed.

61.     Unless this Court grants Plaintiffs' requested relief, Plaintiffs will continue to suffer racial discrimination in Georgia's system of higher education.

## **JURISDICTION**

62.     Pursuant to 28 U.S.C. § 1331, 1343 (a)(3) and 1367(a), Plaintiffs seek declaratory and injunctive relief for deprivations under color of state law of their federal civil rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Equal Protection Clause of the Fourteenth Amendment.

## **VENUE**

63.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to Plaintiffs' claims occurred in the State of Georgia.

## PARTIES

64.     Plaintiffs are impacted by Defendants' discrimination with respect to higher education in Georgia and wish to enforce their rights under Title VI, the Equal Protection Clause of the Fourteenth Amendment, and all other applicable laws.

65.     Plaintiff Martrice Herrington is an alumnus of FVSU.

66.     Plaintiff Marchea Herrington is an alumnus of SSU.

67.     Plaintiff Reginald Hunter is an alumnus of ASU.

68.     Defendant Board of Regents of the State University System of Georgia ("BOR" or "Board of Regents") is an agency and instrumentality of, and created by, the State of Georgia to govern the State's public universities.  Ga. Const. art. VIII, § 4(a).  The USG is governed by the BOR, which sets goals and dictates general policy to educational institutions.  The USG also dispenses public funds to the institutions.

69.     As an agency and instrumentality of the State of Georgia, the BOR shall:

> [H]ave the exclusive authority to create new public colleges, junior colleges, and universities in the State of Georgia, subject to approval by majority vote in the House of Representatives and the Senate.  Such a vote shall not be required to change the status of a college, institution or university existing on the effective date of this Constitution. The government, control, and management of the University System of Georgia and all of the institutions in said system shall be vested in the Board of Regents of the University System of Georgia.

Ga. Const. art. VIII, § 4(a).

70.     Through the receipt of federal funds, the BOR waived its Eleventh Amendment immunity.

71.     Defendant Sony Perdue ("Perdue" or "Chancellor") is sued in his official capacity as the Chancellor and Chief Executive Officer of the USG and of the BOR.   In that capacity, he "provides leadership in higher education and stewardship of state and University System resources by promoting a statewide perspective on higher education that attends to the current and developing needs of the State, its citizens, and students, and relates them effectively to the University System and its institutions.[3]

72.     Defendant Richard Woods ("Woods" or "Commissioner") is sued in his official capacity as a member of the BOR.   Woods is the Commissioner of Education of the State of Georgia.

73.     Defendant Harold Reynolds ("Reynolds") is sued in his official capacity as a member of the BOR.   Reynolds serves as the Chair of the BOR, a role elected by the BOR's nineteen members.   Reynolds also serves as Chair of the BOR's Executive and Compensation Committee.

74.     Defendant Erin Hames ("Hames") is sued in her official capacity as a member of the BOR.   Hames serves as the Vice-Chair of the BOR, a position in

---

[3] *University System of Georgia*. Chancellor | University System of Georgia. (n.d.). https://www.usg.edu/chancellor

which she was elected to serve by the BOR's nineteen members.  Hames also serves as Vice-Chair of the BOR's Executive and Compensation Committee.

75.     Defendant Doug Aldridge ("Aldridge") is sued in his official capacity as a member of the BOR.  In that role, Aldridge serves as Vice-Chair of the BOR's Committee on Finance and Business Operations.

76.     Defendant Tom Bradbury ("Bradbury") is sued in his official capacity as a member of the BOR.  In that role, Bradbury serves as Vice-Chair of the BOR's Committee on Organization and Law.

77.     Defendant Richard Evans Sr. ("Evans") is sued in his official capacity as a member of the BOR.  In that role, Evans serves as Chair of the BOR's Committee on Personnel and Benefits.

78.     Defendant W. Allen Gudenrath ("Gudenrath") is sued in his official capacity as a member of the BOR.

79.     Defendant Samuel D. Holmes ("Holmes") is sued in his official capacity as a member of the BOR.  In that role, Holmes is a participating member of the BOR's Executive and Compensation Committee as well as Vice-Chair of the BOR's Committee on Academic Affairs.  Holmes also serves as a participating member of the BOR's Committee on Intercollegiate Athletics Committee.

80.     Defendant Bárbara Rivera Holmes ("Rivera") is sued in her official capacity as a member of the BOR.  In that role, Rivera serves as Vice-Chair of the

BOR's Committee on Economic Development and as a member of the BOR's Executive and Compensation Committee.

81.     Defendant C. Thomas Hopkins, Jr., MD ("Hopkins") is sued in his official capacity as a member of the BOR.  In that role, Hopkins serves as a member of the BOR's Committee of Graduate Medical Education and as Vice-Chair of the BOR's Committee on Internal Audit, Risk, and Compliance.

82.     Defendant James M. Hull ("Hull"), is sued in his official capacity as a member of the BOR.  In that role, Hull serves as a member of the BOR's Committee of Graduate Medical Education.

83.     Defendant Cade Joiner ("Joiner"), is sued in his official capacity as a member of the BOR.  In that role, Joiner serves as Chair of the BOR's Intercollegiate Athletics Committee and serves as a member of the BOR's USGF, Inc. (University System of Georgia Foundation) Board.

84.     Defendant Patrick C. Jones ("Jones"), is sued in his official capacity as a member of the BOR.  In that role, Jones serves as a participating member of the BOR's Track I Committee.

85.     Defendant C. Everett Kennedy, III ("Kennedy"), is sued in his official capacity as a member of the BOR.  In that role, Kennedy serves as a participating member of the BOR's Executive and Compensation Committee.

86.     Defendant Sarah-Elizabeth Langford ("Langford"), is sued in her official capacity as a member of the BOR.  In that role, Langford serves as Chair of

the BOR's Committee on Organization and Law.   Langford also serves as a participating member of the BOR's USGF, Inc. (University System of Georgia Foundation) Board.

87.   Defendant Lowery Houston May ("May"), is sued in her official capacity as a member of the BOR.  In that role, May serves as Chair of the BOR's Committee on Academic Affairs and as participating member of the BOR's Regents Public Library Advisory Committee.

88.   Defendant Jose R. Perez ("Perez"), is sued in his official capacity as a member of the BOR.  In that role, Perez serves as a member of the BOR's Executive and Compensation Committee and as Vice-Chair of the BOR's Committee on Economic Development.

89.   Defendant Neil L. Pruitt, Jr. ("Pruitt"), is sued in his official capacity as a member of the BOR.  In that role, Pruitt serves as Chair of the BOR's Committee on Finance and Business Operations as well as serves as a member of the BOR's USGF, Inc. (University System of Georgia Foundation) Board.

90.   Defendant T. Dallas Smith ("Smith"), is sued in his official capacity as a member of the BOR.  In that role, Smith serves as a participating member of the BOR's Executive and Compensation Committee and as Chair of the BOR's Committee on Real Estate and Facilities.  Smith as serves as a member of the BOR's USGF, Inc. (University System of Georgia Foundation) Board.

91.     Defendant the State of Georgia ("State" or "Georgia") receives federal funding for its higher education system, including funds utilized for student financial aid and research grants.

92.     There are no SSU, ASU, or FVSU graduates on the BOR, despite there being nine UGA graduates (Bradbury, Gudenrath, Hames, Holmes, Hopkins, Joiner, Jones, May, Perez).  No member of the BOR has a connection to the aforementioned HBCU's and only two members of the BOR are African American.



Top Row: W. Allen Gudenrath, Richard "Tim" Evans, Tom Bradburry, Doug Alridge. Middle Row: Cade Joiner, James M. Hull, C. Thomas Hopkins, Jr., MD., Barbara River Holmes. Bottom Row:  C. Everett Kennedy, III, Jose R. Perez, Lowery Houston May, Neil L. Pruitt, Jr.



Top Row: Vice-Chair Erin Hames, James K. Syfan, III, Patrick C. Jones, Sarah-Elizabeth Langford. Bottom Row: Chair Harold Reynolds, Samuel D. Holmes, T. Dallas Smith, Chancellor Sony Perdue.

93.    Defendant the State of Georgia receives federal funding for its higher education system, including funds utilized for student financial aid and research grants.

94.    All Defendants are recipients of federal financial assistance, including but not limited to, the direction, control, and disbursement of federal funds.

95.    Plaintiffs are current or former students of HBCUs and are/were the intended beneficiaries of federal funding.

## **RELEVANT FACTS**

### **THE HISTORY OF GEORGIA'S HIGHER EDUCATION SYSTEM**

96.    Throughout its history, Georgia has systematically engaged in policies and practices that established and perpetuated a racially segregated system of higher education.

97.    Georgia's university system came into existence when the state legislature passed the Reorganization Act of 1931.  The act called for the creation of the BOR to oversee the State's higher education system, which at that time consisted of twenty-six independently run colleges and universities.

98.    The USG experienced its first major crisis in 1941 during the Cocking affair.  That year, Governor Eugene Talmadge sought the dismissal of Walter Cocking, the dean of UGA's College of Education, asserting that Cocking favored the racial integration of a demonstration school near Athens.

99.    When the BOR failed to comply with Talmadge's request to dismiss the dean, the governor removed three members from the board and replaced them with Talmadge supporters.  Cocking was fired during the next BOR meeting.  As a consequence of Talmadge's interference, the Southern Association of Colleges and Schools withdrew its accreditation of all Georgia's state-supported colleges for whites.

100.    Largely as a result of the Cocking affair, Talmadge lost the next gubernatorial election.  Accreditation (made retroactive to September 1, 1942) was restored in January 1943 to the white colleges.

101.    In 1961, the system witnessed the first battle in what would become a twenty-seven-year-long struggle with desegregation.  Two previous attempts had been made to desegregate the university system, one in 1950 when African American Horace T. Ward applied to UGA and another in 1956 when four African Americans

applied to Georgia State College (later Georgia State University).  These efforts proved unsuccessful.

102.   In 1961, Charlayne Hunter and Hamilton Holmes became the first Black students to attend the University of Georgia, despite attempts by Governor Ernest Vandiver to close the school if it was desegregated.

103.   In 1973, within a period of five days, two different government authorities, the U.S. Department of Health, Education and Welfare and U.S. District Court Judge Wilbur D. Owens, ordered the BOR to submit plans for the complete desegregation of the university system's colleges and universities.

104.   The issue dragged on for more than a decade, as a resistant board presented various plans that were repeatedly judged unsuitable by federal authorities.  In 1983 a plan acceptable to the parties was approved, and in 1988 the university system finally met all the requirements of that agreement.

105.   Currently, the USG designates four institutions as "Research Universities" including: Georgia Institute of Technology, University of Georgia, Augusta University, and Georgia State University.  The University of Georgia is the state and system's flagship university, the state's oldest institution of higher learning, and one of the state's two land-grant universities.

106.   After its 2016 merger with Georgia Perimeter College, Georgia State University became the largest institution of higher learning in the University System of Georgia.  University of North Georgia is the state's designated military school.

There are three historically black schools housed within the University System of Georgia, including: Savannah State University, Albany State University, and the state's second land-grant university, Fort Valley State University.

107.   A comprehensive list of institutions within the University System of Georgia is as follows:

| Institution |
| --- |
| Augusta University |
| Georgia Institute of Technology |
| Georgia State University |
| University of Georgia |
| Georgia Southern University |
| Kennesaw State University |
| University of West Georgia |
| Valdosta State University |
| **Albany State University** |
| Clayton State University |
| Columbus State University |
| **Ft. Valley State University** |
| Georgia College & State University |

| |
|---|
| Georgia Southwestern State University |
| Middle Georgia State University |
| **Savannah State University** |
| University of North Georgia |
| Abraham Baldwin Agricultural College |
| Atlanta Metropolitan State College |
| College of Coastal Georgia |

| |
|---|
| Dalton State College |
| East Georgia State College |
| Georgia Gwinnett College |
| Georgia Highlands College |
| Gordon State College |
| South Georgia State College |

108.   The BOR makes the allocation of funds to the institutions at the April meeting or the next regular meeting following the approval of the Appropriations Act or as soon thereafter as may be practicable in each year.

109.   *Fordice*, decided in 1992, highlighted the actions states must take in order to dismantle the *de jure* segregation in higher education.  The *Fordice* decision

held that where a state has, in the past, operated a *de jure* segregated system of higher education, it must take affirmative measures to eliminate those policies and practices traceable to its prior segregated system.

110.   Even though a state may have abolished the legal requirement that White and Black students be educated separately and may have established policies that were "racially neutral" and not animated by a discriminatory purpose: "policies run afoul of the Equal Protection Clause" if they continue to have segregative effects.

111.   In so doing, *Fordice* identified some examples of policies and practices considered to have the character or effect of prior official racially segregated policies and practices, and the affirmative responses that states must take to address those vestiges of official segregation and thereby work toward dismantling the continual segregation of their education systems.

112.   Among other identified vestiges of official segregation, the *Fordice* Court held that the present-day unnecessary program duplication of non-core unique courses perpetuates policies and practices traceable to the prior *de jure* segregated system, which results in segregative effects in the present day.

113.   Under *Fordice*, the unnecessary duplication of academic programs at historically black institutions and non-historically black institutions of higher learning "was part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of

schools—and . . . present unnecessary duplication is a continuation of that practice."
*Fordice*, 505 U.S. at 738.

114.   As a result of the *Brown* decision, the *Fordice* decision, enactment of
Title VI, and the Equal Protection Clause of the Fourteenth Amendment of the
United States Constitution, Defendants have a constitutional duty to dismantle
former systems of *de jure* segregation in higher education.

115.   Despite such duty, the primary indicators of continuing segregation in
Georgia remain, all of which Georgia has failed to remedy, including: (i) a lack of
program distinctiveness between Georgia's HBCUs and it TWIs, (ii) Defendants'
chronic underfunding of Georgia's public HBCUs; (iii) the failure to enlarge
Georgia's public HBCUs' brand beyond their race-based identity; (iv) the failure to
diversify Georgia's public HBCUs student body, staff and faculty boards; (v) the
failure to diversify the BOR; (vi) the failure to develop Georgia's public HBCUs
campuses, facilities, and infrastructure; and (vii) the failure to increase Georgia's
public HBCUs student retention and graduation rates.

116.   Defendants' failure to eliminate vestiges of segregation in present day
Georgia results in violations of Title VI and the Equal Protection Clause.

## PROGRAM DUPLICATION/LACK OF PROGRAM UNIQUENESS

117.   Defendants' failures to eliminate vestiges of segregation in Georgia's public HBCUs programmatic offerings exist because Defendants have failed to stop or limit unnecessary program duplication.

118.   In 1992, the Supreme Court of the United States issued its opinion in *Fordice*, finding that Mississippi was in violation of the Equal Protection Clause of the Fourteenth Amendment due to its failure to disestablish its segregated system of higher education.  The case highlighted the complex responses states must take in order to dismantle segregated education systems.

119.   In accordance with Georgia's obligations under *Fordice*, Defendants have an obligation to remedy all policies and practices within the State's higher education system that are traceable to the prior segregated system.  This obligation specifically includes the unnecessary duplication of HBCU academic programs by geographically proximate TWIs.

120.   The *Fordice* decision defined unnecessary program duplication as "[t]hose instances where two or more institutions offer the same nonessential or non-core program.  Under this definition, all duplication at the bachelor's level of non-basic liberal arts and sciences course work and all duplication at the master's level and above are considered to be unnecessary." 505 U.S. at 738.

121.  The Court reasoned that program duplication was undeniably "part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and that the present unnecessary duplication is a continuation of that practice." *Id*.

122.  The *Fordice* Court also held that Mississippi's scheme of institutional mission classification perpetuated the State's formerly *de jure* system of segregation because the system determined state funding and curriculum decisions at state institutions. *Id*. at 741-43. The missions and classifications assigned to public universities were directly correlated to the inequalities among the institutions and afforded preferential treatment to TWIs. *Id.*

123.  Upon information and belief, Defendants have instituted certain programs at Georgia's TWIs that duplicate programs at its HBCUs and perpetuate Georgia's dual system of higher education.

124.  The duplicate program offerings at Georgia's TWIs in conjunction with the disparate funding of its public HBCUs and the longstanding history of maintenance of a dual higher education system, creates a state endorsed system of competition that demonstrates a bias and preference for the vitality of TWIs at the expense of state public HBCUs.

125.  A "core" program is defined as all "bachelor's level of non-basic liberal arts and sciences course work." *Fordice*, 505 U.S. at 738.  Any programs that are not essential to providing general and specialized education in the basic liberal arts and

sciences at the undergraduate level, and all master's programs and doctoral programs are considered "non-core." *Id*. The inquiry regarding unnecessary program duplication between Georgia's public HBCUs and their nearby TWIs focuses only on the duplication of non-core programs between the institutions.

126.   The Supreme Court recognized that unnecessary program duplication is a traceable vestige of segregation: "[I]t can hardly be denied that such duplication was part and parcel of the prior dual system of higher education -- the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and that the present unnecessary duplication is a continuation of that practice." *Fordice*, 505 U.S. at 738.[4]

127.   Defendants exert significant control over what programs are offered at the USG institutions and through such control, Defendants have perpetuated segregation in Georgia.

---

[4] *Fordice* further emphasized that "*Brown* and its progeny, however, established that the burden of proof falls on the State, and not the aggrieved plaintiffs, to establish that it has dismantled its prior *de jure* segregated system. The [district] court's holding that petitioners could not establish the constitutional defect of unnecessary [program] duplication, therefore, improperly shifted the burden away from the State." *Fordice,* 505 U.S. at 738-739.

*Regional Comparison of Georgia's Public HBCUs with its Public TWIs*

## I.     Fort Valley State University

128.   Georgia's public TWI Middle Georgia State University ("MGSU") (54% White/Caucasian and 30.7% Black/African American)[5] is the USG Institution that is most geographically proximate to Fort Valley State University.  These two universities are approximately 41 miles from one another.

129.   Based upon a review of USG's listing of Degrees and Majors Authorized as of October 9, 2023, a substantial number of FVSU programs are unnecessarily duplicated at geographically proximate MGSU.  Indeed, a total of 15 out of 29 (or 51.7%) non-core programs are duplicated at the bachelor's level, and 1 program at the master's level.

130.   Duplication of programs inhibits FVSU's ability to grow and impact the State's social/economic activity.

131.   UGA's agricultural program is heavily supported by the State of Georgia, and its output of agriculture professionals and agricultural revenue streams is so large, in overwhelming contrast to FVSU, that any faltering of UGA's agricultural program would be devastating to the State's economy.  The proximity of Abraham Baldwin Agricultural College, having a baccalaureate degree in

---

[5] Based on USG Spring 2022 Semester Enrollment Report by Self-Declared Race/Ethnicity

agriculture, undermines the success of the program at Fort Valley and is problematic for the pursuit (actual or theoretical) of desegregation in the area.

132.   This duplication of agricultural programs is unnecessary, costly, and educationally unsound.  Funds for such programs should be directed toward Federal land grant institutions, of which FVSU is one, who by authority of the Georgia Legislature are vested with responsibility for research and academic activity in this specialized area.

133.   FVSU has some research responsibility funded primarily by the Federal government, but Georgia has not historically matched the funding adequately for the research initiative's success.

134.   Macon State College (founded in 1968 as a Junior college) adversely affects FVSU.  Macon State is somewhat more urban, making the school more attractive than FVSU for many prospective students, therefore minimizing the geographic area served by FVSU.  FVSU maintains a satellite Warner Robins campus that, too, is cannibalized by a competing Macon State College satellite campus in Warner Robins.  Particularly troubling is that in the face of a growing shortage of teachers in Georgia, particularly minority teachers, Macon State has recently been authorized to offer Teacher Education, right in the service area of FVSU.

135.   Upon information and belief, FVSU leadership has communicated a desire to create a satellite engineering program in conjunction with Georgia Institute

of Technology. However, an issue has been raised that Georgia Tech won't allow FVSU to have its own engineering program, which is preventing FVSU from expanding its curriculum.

136. Georgia College and State University ("GC&SU"), founded in 1889 as Georgia Normal & Industrial College and designated with university status in 1996, also adversely affects FVSU's growth.

137. The institutions are senior universities with similar missions, but GC&SU has a defined statewide niche as "Georgia's Liberal Arts University." Upon information and belief, between the years l980 and 2006, GC&SU received $76 million from the State for capital project funding; during the same period FVSU received $43 million from the State for capital project funding. With superior funding and all its accompanying benefits, "Georgia's Liberal Arts University" has a clear competitive advantage over FVSU.

138. Upon information and belief, Macon State College received $46 million in capital funding from 1980-2006. Macon State expended $5 million on an academic classroom building for its Warner Robins campus (which is within a 24-mile radius of FVSU), the most expensive building is the Nursing Health Science building totaling $16 million, and a $22.2 million Professional Sciences building.

139. The largest project at FVSU was the sports complex that totaled $19 million. The highest funded construction for an academic building appears to be a classroom building funded in 1993 totaling $5.4 million.

## II.    Savannah State University

140.   Georgia's public TWIs <u>College of Coastal Georgia</u> ("CCG) (63.2% White/Caucasian and 18.5% Black/African American) and <u>Georgia Southern University</u> ("GSU") (57.8% White/Caucasian and 27% Black/African American) are the USG Institutions that are most geographically proximate to <u>Savannah State University</u>.  SSU is approximately 57 miles from GSU and approximately 77 miles from CCG.

141.   Based upon a review of USG's listing of Degrees and Majors Authorized as of October 9, 2023, a substantial number of SSU's programs are unnecessarily duplicated at either geographically proximate GSU or CCG.  Indeed, a total of 19 out of 32 (or 59.4%) non-core programs are duplicated at the bachelor's level, and 3 out of 5 (or 60%) programs at the master's level.

142.   SSU has a respectable Marine Science Program, but Skidaway Institute, created in 1967 by a commission of the Georgia General Assembly and transferred to the University System in 1971, is responsible for major marine science activity in Georgia and is completely independent from SSU.

143.   Upon information and belief, the Federal government recommended SSU's Marine Sciences program to be operated as a major niche program for the University System.  Instead, even though SSU was poised and geographically positioned to assume this function, Skidaway Institute remains as an independent

component of the University System and is host to major research initiatives, including research conducted by UGA.

144.   Upon information and belief, the 1978 Plan articulated that business programs on both the undergraduate and graduate level in Savannah should be offered solely and exclusively by SSU.  Significant progress toward desegregation of SSU from 1979 to 1989 was due to the Business School's success.

145.   In the fall of 1984, SSU's total enrollment was 2011; 364 (18.1 %) were White.  In the MBA program that year were 68 students; 8 were Black and the other 60 were White.   From 1979 to 1989, SSU's minority (non-Black) enrollment averaged 18.5%.  After that period, which was after the time that the Office of Civil Rights stopped monitoring Georgia's university desegregation efforts, the BOR dismantled SSU's MBA and other graduate programs and transferred those programs to Georgia Southern.

146.   White enrollment at SSU declined dramatically, averaging less than 9%.   Although graduate programs were restored near or around 1996, the dismantling of such graduate programs was a deviation from the desegregation plan, and had adverse effects on the institutions' ability to attract a diverse student populous, funding, upgrades, etc.

147.   In or around 1996 when the BOR authorized the return of graduate programs back to SSU, the MBA program SSU once offered was not returned with the other graduate programs.  Instead, the MBA program was to be offered solely by

Georgia Southern in Savannah.  In 2005, after years of pursuance, the BOR finally authorized the reinstatement of the MBA program at SSU.  This was done, however, with no funding or support, and also with the stipulation that Georgia Southern be allowed to maintain its' graduate MBA program in Savannah, as well.

148.   Upon information and belief, the State's decision to remove the MBA program from SSU also discouraged and compromised any efforts to gain accreditation by The Association to Advance Collegiate Schools of Business ("AACSB"), a premier accreditation agency for business programs.

149.   AACSB accreditation has historically been associated with business programs having strong research orientation, often at doctoral institutions.  Without the presence of at least one graduate program, SSU's role in Business Administration education was stripped of its research component, affecting the school's perceived worth.  In 2005, SSU did achieve AACSB accreditation despite the State's sabotage.

150.   SSU once offered a successful, nationally accredited teacher education program with a sizeable federally-funded budget.  However, the State transferred SSU's teacher education program to Armstrong Atlantic State University (the youngest institution in the area) in 1978.  SSU established success in producing minority teachers should not be ignored.  Returning Teacher Education to SSU would be both a practicable and educationally sound approach to addressing the national and State emergencies of teacher shortages.

151.  SSU was the pioneer in Engineering Technology, as proven by early national accreditations.  However, the BOR and the State of Georgia created Southern Polytechnic State University to be "Georgia's Technology University."

152.  Upon information and belief, the State recently built an engineering facility in Savannah to be operated by Georgia Tech but chose to make no improvements to SSU's Engineering Technology facility (Benjamin F. Hubert Technical Science Building) which was constructed in 1960, is out of compliance with Americans with Disabilities Act guidelines, and in which traces of asbestos have been found.  The dilapidated facility is nothing more than a catalyst for the program's decay.  Funding for a new Science and Engineering Technology facility has been waitlisted.  In addition, funding for a new academic classroom building has been wait-listed.

153.  SSU's facilities are poor in comparison to the facilities at historically-White Institutions.  On SSU's list of most-needed capital project funding for 2008 was $6.5 million for new HVAC systems as the then current systems were not adequate to provide acceptable indoor air quality.

154.  Upon information and belief, between the years of 1980 and 2006, SSU only received about $52 million from the State for capital project funding.  A large portion of these funds was designated for renovations of existing facilities that were old, dilapidated, and/or outdated, yet, like FVSU, the most expensive building constructed on campus is the sports complex which cost $ 11.8 million.

155.   The academic facility having the highest new-construction cost is the Business building that cost $3 million.  Compare the State's capital project funding for other colleges and universities during the 1980-2006 period: Armstrong Atlantic State -$58 million (Armstrong has a $28 million Science building and a $ 10 million Criminal Justice building), Medical College of Georgia -$166 million, Georgia Southern University -$212 million.

## III.   <u>Albany State University</u>

156.  Georgia's public TWIs <u>Georgia Southwestern State University</u> ("GSWU) (61.4% White/Caucasian and 25.6% Black/African American) and <u>Abraham Baldwin Agricultural College</u> ("ABAC") (79.2% White/Caucasian and 8.9% Black/African American) are the USG Institutions that are most geographically proximate to <u>Albany State University</u>.  ASU is approximately 41 miles from GSWU and approximately 40 miles from ABAC.

157.  Based upon a review of USG's listing of Degrees and Majors Authorized as of October 9, 2023, a substantial number of ASU's programs are unnecessarily duplicated at either geographically proximate GSU or CCG.  Indeed, a total of 19 out of 30 (or 63.3%) non-core programs are duplicated at the bachelor's level, and 1 program at the master's level.

158. ASU's signature programs - Teacher Education, Criminal Justice, Forensic Science, and Nursing - are inconsequential relative to the impact upon the

State from such programs at historically-White institutions at which such programs have been nurtured to notability.

159.    Georgia has failed in the face of pointed requests to initiate a pilot or special initiative program at ASU to produce more minority teachers in this State, where the shortage of minority teachers is alarming.

160.    ASU has shown major strides in the Criminal Justice field; the Forensic Science major is unique in the State.  Given that national security is a growing concern, ASU's Criminal Justice and Forensic Science programs should be utilized as a special or pilot program for improvement of Georgia's homeland security efforts. However, such programs are heavily duplicated throughout the State making it hard, if not impossible, for ASU to develop and claim homeland security as a niche program of significant importance impacting the State of Georgia.

161.    ASU was founded in 1903, obtained 4-year college status in 1943, and is designated by the BOR as a State University currently offering 35 undergraduate degrees, 13 Master degrees and 1 Education Specialist Degree.

162.    GSWU was founded in 1906, three years after ASU, and became a four-year college in 1964.  GSWU is approximately 40 miles away from ASU and currently offers 33 undergraduate degree programs, nineteen 19 Master degree programs and 2 Education Specialist degree programs.

163.    Valdosta State University ("VSU"), also founded in 1906, became a four-year college in 1922, became co-educational in 1950, and gained university

status in 1993. VSU is designated by the BOR as a Comprehensive University and is approximately 87 miles away from ASU. VSU offers 61 undergraduate degrees, 39 Master degrees, 17 Education Specialist degree programs and four 4 Doctoral degrees.

164. In comparing ASU with GSWU and VSU, the following duplication of degree offerings is found: 6 of the undergraduate degree programs and five 5 of the Master degree programs offered by ASU are also offered by GSWU; 10 of the undergraduate degree programs and six 6 of the Master degree programs offered by VSU are also offered by ASU.

165. ASU has historically maintained degree offerings which are traditional for HBCUs with the exception of six undergraduate degrees: Bachelor of Applied Science with a Major in Computer Information Systems, Bachelor of Applied Science with a Major in Technology Management, Bachelor of Science with a Major in Business Information Systems, Bachelor of Science with a Major in Computer Science, Bachelor of Science with a Major in Criminal Justice, and Bachelor of Science with a Major in Forensic Science. Virtually nothing in terms of State resources was provided to establish any of these non-traditionally-Black degree programs. These degree programs are attractive and relevant to today's global and economic environments, thus having the potential to draw a diverse and talented pool of students to ASU. However, instead of investing in these programs to enhance the quality of ASU students' educational experience and to raise ASU to a place of

prestige, the State of Georgia duplicated these degree programs at GSWU or VSU, competing majority-White institutions that have historically been favored over ASU.

## FUNDING DISPARITIES

166.   Defendants have perpetuated a dual and unequal education system by: (i) failing to match FVSUs federal land grant funds at a one-to-one match, a practice which courts have found is traceable to *de jure* segregation[6]; (ii) chronically underfunding Georgia's public HBCUs; and (iii) funding Georgia's public HBCUs at a per-student allocation less than Georgia's public TWIs.

167.   Defendants' allowance for duplication of the programs at the State's public HBCUs is in violation of the Equal Protection Clause and *Fordice*.

168.   The lack of investment in Georgia's public HBCUs, since the time of official segregation and continuing to this day, translates into fewer resources for students and faculty and perpetuates the vestiges of *de jure* segregation.

### A. Defendants Failure to Match Federal Land Grant Funds

169.   Georgia has two land-grant institutions, UGA, which was established by the First Morrill Act of 1862 (or "1862 land-grant institutions") and is a TWI, and FVSU, which was established by the Second Morrill Act of 1890 ("1890 land-grant institutions").

---

[6] *Ayers v. Fordice*, 111 F.3d 1183, 1215-17, 1221-25 (5th Cir. 1997); *Knight v. Alabama*, 14 F.3d 1534, 1546-52 (11th Cir. 1994).

170.   The First Morrill Act was designed to foster the development, in each state, of "at least one college where the leading object shall be, without excluding other scientific and classical studies and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life." *See* 7 U.S.C. § 304.

171.   The First Morrill Act did not explicitly exclude African Americans, but allowed segregated states, like Georgia, to exclude Black citizens from its benefits.

172.   Prior to the Second Morrill Act, people of color were excluded from educational opportunities at land-grant institutions established by the First Morrill Act.  The Second Morrill Act required states to establish separate land-grant institutions for Black students or demonstrate that admission to the state's 1862 land-grant institution was not restricted by race.

173.   Thus, FVSU was designated as an 1890 land-grant institution by Georgia precisely to maintain *de jure* segregation.  Georgia's intent was to continue receiving federal funding for UGA, its White only land-grant institution, without having to admit Black students to that institution.

174.   The U.S. Department of Agriculture ("USDA") provides federal funding to 1862 and 1890 land-grant institutions to help support their research.

175.  Public land-grant institutions can apply for federal grants for this purpose.  Federal legislation stemming from the First Morrill Act obligates states, including Georgia, to match federal land-grant funding received by 1862 land-grant institutions (like UGA) on a dollar-to-dollar basis.  However, states, like Georgia, are only required to provide at least 50% in matching funds to land-grant institutions established pursuant to the Second Morrill Act in 1890, such as FVSU.

176.  Federal legislation also allows Georgia to seek institutional waivers of its requirement to match at least 50% of the federal funding granted to land-grant institutions established by the Second Morrill Act, like FVSU, but not a waiver for the State's obligation to 100% match federal funds given to land-grant institutions established under the First Morrill Act, like UGA.  Thus, Georgia is permitted to seek a waiver for any fiscal year it decides to withhold its required 50% match of federal funds provided to FVSU.

177.  Defendants have discretion in their determination of whether to allocate one-to-one matching of federal land grant funds to FVSU.

178.  Historically, Georgia has consistently decided to provide less than 100% matching of federal funds to FVSU.  This is to FVSUs significant detriment and is despite the State's obligation to ensure adequate funding to FVSU per its various commitments and pursuant to *Fordice*.

179.  Specifically, using readily available data from the National Center for Education Statistics (NCES) Integrated Postsecondary Education Survey (IPEDS)

that ranges from 1987 to 2020, an additional $603,156,480 should have been made available to FVSU.[7]

180.   Defendants are responsible for the inequity in the State's one-to-one matching of federal funds granted to FVSU with State funds, which significantly disadvantages FVSU, which is also more reliant on the State's funding than UGA.

181.   The State's failure to match at 100% the federal funds granted to FVSU, as the State has consistently done for UGA, is within the State's sole discretion and is not in any way caused by the federal government or the U.S. Department of Agriculture.

182.   Georgia has made the intentional decision to not match FVSU's land grant funds at 100% match, which is consistent with its intention to not equitably fund FVSU.

### B. Defendants Failure to Equitably Fund Georgia's Public HBCUs

183.   From its inception, Georgia's higher education system was not built on equality or accessibility, but on educating—and prioritizing—White students. FVSU, SSU, ASU and their Black students have always been an afterthought.

---

[7] Letter dated September 18, 2023 from the U.S. Secretary of Education and the U.S. Secretary of Agriculture to Governor Brian Kemp.

184.   For example, in FY 2007, UGA received $347,979,483 from the State in appropriations, while FVSU, SSU and ASU received $19,876,316; $17,337,744; and $20,718,371, respectively.

185.   Funding to Georgia's public HBCUs has historically and significantly lagged behind that of its public TWIs, and the same echoes today.   During the time of *de jure* segregation, Georgia's public HBCUs were supposed to be separate and equal but were unequal in every way and funded unequally by the Defendants disproportionally to Georgia's TWIs.

186.   Post *Brown*, in which dual systems were recognized as unconstitutional, FVSU, SSU and ASU have remained underfunded relative to Georgia's TWI's.

187.   FVSU, SSU and ASU are also at a competitive disadvantage because their private gifts, grants and contracts make up a small percentage of overall revenue.

188.   FVSU, SSU and ASU are also relatively smaller institutions, with 2,301 students enrolled at FVSU, 2,606 students enrolled at SSU and 5,881 students enrolled at ASU in the Spring 2023 semester, as compared to 39,373 students enrolled at UGA during the same semester.

189.   As schools with smaller student populations, FVSU, SSU and ASU require more State-allocated funding per student to service their student populations, since they lack economies of scale.   Therefore, FVSU, SSU and ASU are adversely affected by the phenomenon of economies of scale.

190.   Economies of scale recognizes the cost advantages that enterprises obtain due to their scale of operation.   In the context of university spending, institutions (like FVSU, SSU and ASU) with fewer students require more funding per student as compared to larger institutions (like UGA), as the costs of the institution are spread out over less students.   In other words, having a larger number of students reduces the operating cost per student, and therefore would require less spend per student for the same costs that the smaller school also pays.   This means that on-par per student funding between relatively small and relatively larger schools is not in fact equal, as fewer students are bearing the same costs that are spread out over many more students at larger schools.

191.   To eliminate the vestiges of segregation, as required by *Fordice*, FVSU, SSU and ASU require more per student funding than Georgia's TWIs, especially because FVSU, SSU and ASU lack economies of scale, lack other sources of revenue and have been historically deprived of equity in funding.   Nonetheless, for the Fall 2022 semester, State appropriations to FVSU amounted to $8,391.87 per student; State appropriations to ASU amounted to $4,166.89 per student; and State appropriations to SSU amounted to $6,612.59 per student, compared to UGA, which received $9,655.70 per student and Augusta University, which received $23,381.58 per student.

## LACK OF CAPITAL IMPROVEMENTS/ENHANCEMENTS

192.   Despite their constitutional obligations, upon information and belief, Georgia's public HBCU's have received, and continue to receive, substantially less in capital funding from the State than its TWIs.

193.   For example, upon information and belief, the total bond package for capital projects for the Board of Regents was approximately $223.86 million for fiscal year 2015.  The bond package included:

- $40 million for Major Repairs and Rehabilitation (MRR) to be split between all of the State's institutions.

- $4.0 million for MRR at the Cooperative Extension and Agricultural Experiment Station.

- $14.9 million for equipment for buildings at Georgia Regents University ($5 million), Georgia State University ($7 million) and Clayton State University ($2.9 million).

- $54.2 million in construction funds for projects at the University of Georgia ($44.7 million) and Georgia Southern University ($9.5 million).

- $6.6 million in planning and design funds for Georgia Institute of Technology ($1.7 million) Albany State University ($1.4 million) Georgia College and State University ($1 million) and Savannah State University ($2.5 million).

- $44.85 million for 13 small capital projects are various institutions, as follows:
  - $4.5 million to Georgia Institute of Technology;
  - $3.8 million to Georgia Regents University;
  - $7.75 million to University of Georgia;
  - $1.9 million to Valdosta State University;
  - $2.7 million to Armstrong Atlantic State University;
  - $4.95 million to Columbus State University;
  - **$750,000 to Fort Valley State University;**
  - $3.9 million to Georgia College and State University;

- o $2.5 million to <u>University of North Georgia;</u>
- o $2.5 million to <u>Atlanta Metropolitan State College;</u>
- o $2.7 million to <u>Abraham Baldwin Agricultural College;</u>
- o $4.4 million to <u>Gordon State College;</u> and
- o $2.5 million to <u>South Georgia State College.</u>

- $5.0 million for Facility Improvements for Roosevelt Warm Springs at <u>Georgia Regents University.</u>

- $10.0 million for Science Park Phase II at <u>Georgia State University</u>.

- $11.5 million for Design and Construction of a Turfgrass Research and Education Building at the <u>University of Georgia</u>.

- $300,000 for the Tift Building at the <u>University of Georgia</u>

- $1.0 million for equipment at the Agricultural Experiment Station.

- $9.9 million for the Purchase of Brandsmart Property at <u>Kennesaw State University</u>.

- $2.0 million for the Aviation College Airplane Replacement (Multi-Year Plan) at <u>Middle Georgia State College.</u>

- $2.5 million for Digital Broadband PeachNet Access at the Regents Central Office.

- $8.97 million for the Georgia Research Alliance equipment

- $6.78 million for the Georgia Public Libraries.

- $1.36 million for Georgia Public Telecommunications

The fiscal year 2015 budget also includes capital redirects related to the University System of Georgia, including:

- Redirect $799,963 in 5-year unspent bond proceeds from FY 2010 for the design of the academic building at <u>Georgia Perimeter College</u> to be used for equipment at the Reese Library Building at <u>Georgia Regents University</u>.

- Redirect $678,990 in 20-year unspent bond proceeds from FY 2011 for <u>Augusta State University</u> to be used for HVAC modification at the Student Center, <u>Darton State College</u>.

194.   To put this in perspective, upon information and belief, in fiscal year 2015, Georgia Regents University received $173,699,931 in State appropriations and an additional $14,599,963 in funding for capital improvements/enhancements – for a total State contribution of **$188,299,894**.   Whereas, FVSU received $19,833,755 in State appropriations and an additional $750,000 in funding for capital improvements/enhancements – for a total State contribution of **$20,583,755**, which is **<u>$167,716,139</u>** less than what Georgia Regents University received that year from the State.[8]   Similar disparities exist in regards to Georgia's other public HBCUs.

195.   The disparity between UGA and FVSU (Georgia's two land-grant institutions) is more glaring.   UGA received $317,082,785 in State appropriations and an additional $64,250,000 in funding for capital improvements/enhancements – for a total State contribution of **$381,332,785**.   The difference between what UGA

---

[8] This calculation does not consider the $40 million for MRR to be split between all of the State's institutions.   Assuming that the split was even, the net result would be a wash.   However, if the split was uneven, it could increase this disparity.

received from the State during fiscal year 2015 and what FVSU received is **$360,749,030**.

196.   Additionally, upon information and belief, the time from proposed funding to final funding for capital improvement projects at Georgia's TWIs is substantially shorter than it is at Georgia's HBCUs.

197.   Upon information and belief, the State has also continually failed to provide the appropriate contracts, contractors, supplies, and appropriations for timely completion of projects at its public HBCUs.

198.   Upon information and belief, when projects at HBCUs are not timely completed, HBCUs are precluded from receiving capital projects budgets necessary to fund additional and existing projects.

199.   The State's failure to fund capital projects and provide appropriate funding for renovations and refurbishments at its public HBCUs detrimentally impacts the universities' students and faculty by limiting sufficient space for classes, extra-curricular activities and housing.

200.   The operational funding levels and the condition of Georgia's public HBCUs campuses, facilities, and infrastructure undoubtedly have a direct impact on students' choice of which institution to attend. Defendants' neglect of such facilities, infrastructure, general campuses, and the capital enhancements needed by Georgia's public HBCUs is merely a continuation of the State's centuries-long practice of relegating these institutions to a subpar separate and unequal status.

**COUNT I**
**Violation of Title VI, 42 U.S.C. § 2000d, et seq.**
(Intentional and/or Disparate Impact)
Against Defendants State of Georgia and BOR
(the "Title VI Defendants")

201.   Plaintiffs hereby incorporate by reference the allegations set forth in all of the above paragraphs as if fully set forth herein.

202.   All of the Plaintiffs are African American.

203.   Title VI states, in relevant part, that "[N]o person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

204.   The Title VI Defendants are recipients of federal financial assistance, including but not limited to, the direction, control, and disbursement of federal funds.

205.   The Title VI Defendants received and continue to receive federal funding to support Georgia's higher education system.

206.   Many of Georgia's institutions of higher learning participate in a variety of federally-funded programs, including but not limited to funding for research and student loans.  Georgia also receives federal funds for its two land-grant institutions, FVSU and UGA.  As a result of the Title VI Defendants' participation in federally funded programs, the Title VI Defendants and Georgia's colleges and universities are governed by the mandate of Title VI.

207.   Federal funds are received and then disbursed by the Title VI Defendants to colleges and universities in Georgia.  The Title VI Defendants then use those federal funds to provide direct support to the State's public colleges and universities, including for research or facility development at the educational institution, and through grants and loans made to students enrolled in postsecondary institutions, among other ways.

208.   Plaintiffs are and were the intended beneficiaries of the federal funds provided to the Title VI Defendants.

209.   The Title VI Defendants have engaged in a pattern and practice of intentional discrimination with respect to FVSU, SSU and ASU in violation of Title VI of the Civil Rights Act of 1964.

210.   The Title VI Defendants have intentionally discriminated by maintaining a segregated system of higher education at FVSU, SSU and ASU due to the Title VI Defendants' failure to eliminate vestiges of the prior *de jure* segregated system of higher education in Georgia and have done so by their actions as described herein, including by the Title VI Defendants perpetuating unnecessary duplication of FVSU's, SSU's and ASU's non-core programming at geographically proximate Georgia TWIs, failing to create a meaningful number of unique non-core programs and unique high demand programs at FVSU, SSU and ASU, intentionally failing to provide adequate funding to FVSU, SSU and ASU, failing to match at 100% the

federal land-grant funds provided to FVSU, and failing to make improvements in FVSU's, SSU's and ASU's facilities.

211.   The Title VI Defendants have engaged in a long-term pattern and practice of failing to perform their duty to enforce State and federal laws for the provision of equal educational opportunity for Black students at FVSU, SSU and ASU.

212.   The Title VI Defendants have continued to discriminate on the basis of race, including through discriminatory funding practices and underfunding of FVSU, SSU and ASU, perpetuating unnecessary duplication of FVSU's, SSU's and ASU's non-core programming at geographically proximate Georgia TWIs, failing to create a meaningful number of unique non-core programs and unique high demand programs at FVSU, SSU and ASU, failing to match at 100% the federal land-grant funds provided to FVSU, and failing to make improvements in FVSU's, SSU's and ASU's facilities, on the basis of race, which actions and inactions stem from prior *de jure* segregative policies and thereby perpetuates Georgia's present day segregated system of higher education in violation of Title VI of the Civil Rights Act.

213.   The Title VI Defendants have also failed in their duty to eliminate the vestiges of Georgia's formerly *de jure* segregated system of higher education by, among other things, perpetuating unnecessary duplication of FVSU's, SSU's and ASU's non-core programming at geographically proximate Georgia TWIs, failing to

create a meaningful number of unique non-core programs and unique high demand programs at FVSU, SSU and ASU, intentionally failing to provide adequate funding to FVSU, SSU and ASU, failing to match at 100% the federal land-grant funds provided to FVSU, and failing to make improvements in FVSU's, SSU's and ASU's facilities, which failures have caused FVSU, SSU and ASU to remain segregated entities of higher learning.

214.   The Title VI Defendants are recipients of federal funds, and federal funds were used by the Title VI Defendants to carry out these discriminatory practices.

215.   Alternatively, in lieu of intentional discrimination, Plaintiffs allege that the Title VI Defendants' discriminatory actions, as described herein, disparately impacted Plaintiffs as students of FVSU, SSU and ASU in a discriminatory and unfair manner because such actions negatively impacted other non-minority student enrollment at FVSU, SSU and ASU.

216.   The Title VI Defendants' actions are a direct result of their failure to eliminate *de jure* era policies that discriminate on the basis of race in higher education, like, among other things, perpetuating unnecessary duplication of FVSU's, SSU's and ASU's non-core programming at geographically proximate Georgia TWIs, failing to create a meaningful number of unique non-core programs and unique high demand programs at FVSU, SSU and ASU, intentionally failing to provide adequate funding to FVSU, SSU and ASU, failing to match at 100% the

federal land-grant funds provided to FVSU, and failing to make improvements in FVSU's, SSU's and ASU's facilities.   Such actions are traceable to and serve to perpetuate Georgia's prior *de jure* segregated system of higher education in the present day.

217.   As a direct and proximate result of the Title VI Defendants' utilization of federal funds in a racially discriminatory manner, which results in maintaining a *de jure* system of segregation in Georgia's higher education system, Plaintiffs as students of FVSU, SSU and ASU, have been and continue to be denied equal educational opportunities and are subjected to discrimination in a segregated educational environment in violation of Title VI, all because of their race.

### COUNT II - 42 U.S.C. § 1983
### Violation of Equal Protection Clause
Pursuant to the Fourteenth Amendment of the United States Constitution
Against Defendants BOR Members, Sony Perdue, and Richard Woods
(the "1983 Defendants")

218.   Plaintiffs hereby incorporate by reference the allegations set forth in all of the above paragraphs as if fully set forth herein.

219.   The Equal Protection Clause of the Fourteenth Amendment provides as follows:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life,

liberty, property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

220.   All Plaintiffs are born or naturalized citizens of the United States and enjoy the constitutional protections of the Equal Protection Clause of the Fourteenth Amendment.

221.   Pursuant to *Fordice*:

> If the State perpetuates policies and practices traceable to its prior de jure dual system that continue to have segregative effects – whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system – and such policies are without sound educational justification and can be practicably eliminated, the policies violate the Clause, even though the State has abolished the legal requirement that the races be educated separately and has established racially neutral policies not animated by a discriminatory purpose.

*Fordice*, 505 U.S. at 718-733.

222.   The 1983 Defendants have engaged in a pattern and practice of intentional discrimination with respect to FVSU, SSU and ASU in violation of the Equal Protection Clause of the Fourteenth Amendment and under *Fordice*.

223.   The 1983 Defendants have continued to operate a segregated system of higher education in Georgia that stems from policies and practices traceable to Georgia's prior *de jure* system of segregated higher education, and Defendants

continue to take actions to perpetuate that segregated system in violation of the Equal Protection Clause and *Fordice*.

224.   The 1983 Defendants have failed in their duty to adequately and appropriately fund FVSU, SSU and ASU in violation of the Equal Protection Clause and *Fordice*.

225.   The 1983 Defendants have failed to adequately fund FVSU, SSU and ASU by: (1) failing to match FVSUs federal land grant funds at a one-to-one match; (2) chronically underfunding FVSU, SSU and ASU, which are smaller institutions, require more per student funding due to economies of scale and due to their dependence on State funding from years or past underfunding and their competitive disadvantage in seeking funding from private gifts, grants and contracts; (3) funding FVSU, SSU and ASU at a per-student allocation less than Georgia's TWIs; and (4) implementing the Funding Formula, which relies on metrics skewed by *de jure* segregative practices, and unfairly compares schools that serve populations of different socioeconomic backgrounds.

226.   The 1983 Defendants have also permitted Georgia's TWIs to unnecessarily duplicate non-core unique programs without any justification, in violation of the Equal Protection Clause and *Fordice*.

227.   The 1983 Defendants have also failed to fund improvements in FVSU's, SSU's and ASU's campuses, facilities, and infrastructure.

228.   The 1983 Defendants have thus perpetuated a segregated system of higher education in Georgia in violation of the Equal Protection Clause of the Fourteenth Amendment and *Fordice*.

229.   The 1983 Defendants have also thus violated the equal protection rights of Plaintiffs, and the 1983 Defendants acted with intent or with deliberate indifference to the rights of Plaintiffs.

230.   As a direct and proximate result of the 1983 Defendants' violation of the Equal Protection Clause, Plaintiffs, as students of FVSU, SSU and ASU, were denied and continue to be denied equal educational opportunities and are subjected to discrimination in a segregated educational environment, in violation of the Fourteenth Amendment to the United States Constitution, all because of their race.

231.   Plaintiffs will suffer irreparable harm in the absence of injunctive relief.

232.   The balance of equities tips in the favor of Plaintiffs, and an injunction is in the public's best interest.

## <u>COUNT III</u>
### <u>Violation of Equal Protection Clause: Disparate Impact Discrimination</u>
Against Defendants BOR Members, Sony Perdue, and Richard Woods
(the "1983 Defendants")

233.   Plaintiffs hereby incorporate by reference the allegations set forth in all of the above paragraphs as if fully set forth herein.

234.   The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.SC. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

235.   Under the Equal Protection Clause of the Fourteenth Amendment, discrimination on the basis of race is presumptively unconstitutional, subject to heightened scrutiny, and may be established by a "totality of the circumstances."

236.   Plaintiffs are Black students who have attended and currently attending FVSU, SSU and ASU, the only public HBCUs in the State of Georgia.  Plaintiffs are therefore members of a protected class under the Equal Protection Clause of the Fourteenth Amendment.

237.   The 1983 Defendants have acted under the color of state law in discriminating against Black students in Georgia by maintaining unlawful funding practices which adversely impact FVSU's, SSU's and ASU's ability to: attract a diverse student population (unconstitutionally preserving a racially segregated university); cultivate unique, non-core programs (preventing FVSU, SSU and ASU from creating their own distinct identity separate from race); competitively compensate faculty (inhibiting FVSU, SSU and ASU from attracting diverse and prestigious faculty, raising student retention and graduation rates, and increasing the number of research grants awarded), and fund the development of capital enhancements and renovations to its campus, facilities, and infrastructure.  These

adversities faced by FVSU, SSU and ASU today are the direct result of Georgia's longstanding practice of underfunding its only public HBCUs.

238.   As a direct and proximate result of the conduct of the 1983 Defendants, Plaintiffs, as Black students of FVSU, SSU and ASU, have been and continue to be denied equal educational opportunities and are subjected to a de facto system of present-day segregation, in violation of the Equal Protection Clause of the U.S. Constitution.

239.   Plaintiffs will suffer irreparable harm in the absence of injunctive relief.

240.   The balance of equities tips in the favor of Plaintiffs, and an injunction is in the public's best interest.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray the Court award the following relief:

A. Declare that Defendants' conduct violates Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment;

B. Permanently enjoin Defendants and all of their agents, representatives, and officers from continuing the abuses described herein, including acting in a manner inconsistent with the U.S. Constitution, the Georgia Constitution, and the State of Georgia's equal education opportunity obligations under state and federal law, including Title VI, the Equal Protection Clause of the Fourteenth Amendment, and *Fordice*;

C. Appoint a special referee or mediator in order to craft and recommend a remedy to the Court in order to correct the Title VI and the constitutional violations as alleged herein;

D. Award Plaintiffs the costs of this action together with their reasonable attorneys' fees; and,

E. Grant Plaintiffs such other and further relief as may be appropriate or necessary, including injunctive relief as necessary.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs respectfully request a trial by jury as to all matters so triable.

Dated:  October 24, 2023

_____
John A. Moore (Ga. Bar No. 519792)
**THE MOORE LAW GROUP, LLC**
1745 Martin Luther King Jr. Dr.
Atlanta, Georgia 30314
(678) 288-5600 Telephone
(888) 726-4355 Facsimile
Counsel for Plaintiffs

-And-

/s/ Carlos E. Moore

_____
Carlos E. Moore, Esq.
(Pro Hac Application to be Filed)
**THE COCHRAN FIRM**
**MISSISSIPPI DELTA**
P.O. Box 1487
Grenada, MS 38902
662-227-9940 Telephone
662-227-9941 Facsimile